[No. C034064. Third Dist. Aug. 23, 2001.]

In re the Marriage of JOYCE DAVIS and PHILLIP STANLEY WOLFE.
JOYCE DAVIS WOLFE, Respondent, v.
PHILLIP STANLEY WOLFE, Appellant.

**[Opinion certified for partial publication.†]**

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, II, III and IV.

## COUNSEL

Hoseit & Koelewyn, H. L. Koelewyn; Ishikawa Law Office and Brendon Ishikawa for Appellant.

Eisen & Johnston Law Corporation, Jay-Allen Eisen, Marian M. Johnston, Frederic L. Snowden; Law Offices of Larry L. Lawson and Larry L. Lawson for Respondent.

## OPINION

**CALLAHAN, J.**—Phillip Stanley Wolfe (Phillip) and Joyce Davis Wolfe (Joyce) separated in May 1994, following an 11-year marriage. Phillip appeals from the August 25, 1999, judgment of dissolution following trial on the property issues. He argues the court erred in: (1) dividing equally the $60,000 equity line debt; (2) reimbursing Joyce for separate property payments toward daily living expenses incurred during the first six months of 1994; (3) reimbursing Joyce for her share of community funds spent on the community property ranch during the marriage; and (4) reimbursing Joyce for her share of community funds spent on Phillip's separate parcel during the marriage. We modify the judgment by striking the $3,112.50 Phillip was ordered to reimburse the community for payment of property taxes on his separate parcel, and affirm the judgment as modified.

### FACTUAL AND PROCEDURAL BACKGROUND

Evidence at trial revealed that Phillip and Joyce maintained separate and community property bank accounts during their marriage. The court found it difficult to trace separate property contributions over a period of nearly 11 years. However, it found that at the time of separation, Phillip and Joyce held as community property a single-family residence in Newcastle, and a vineyard near Fresno which they referred to as "the ranch." Phillip owned real property adjacent to the vineyard as his separate property.

During the marriage, Phillip and Joyce established a $60,000 line of credit secured by a second deed of trust to build a swimming pool at the Newcastle residence. In March 1994, they owed more than $44,000 on the loan. On April 4, 1994, a month before filing for dissolution, Joyce paid off the credit line debt with separate property funds from her business savings account. The source of the funds in that account was a $90,000 gift from her mother.

In June 1994, after filing for dissolution, Joyce asked the bank to freeze the $60,000 line of credit. She was concerned she would be required to pay it off "whether [she] had it or not." The bank refused the request, explaining that "the money was available to both parties." At that point, Joyce withdrew the entire $60,000, and deposited it into her separate savings account. Joyce used approximately $45,000 to repay the separate property funds she used to pay off the line of credit in April. In September 1994, Joyce gave Phillip $15,000 of the $60,000 on stipulation that it be used exclusively to harvest the raisin crop at the Fresno ranch.

Joyce kept the equity loan "maxed out to keep from having it taken" while she continued to make payments. The $60,000 loan balance on the equity

line, plus $855.24 in interest, was repaid in escrow on the sale of the Newcastle residence a year before trial.

In the first part of 1994, the community paid $19,667 in expenses for the Fresno ranch. However, Phillip kept at least $40,000 of the 1994 harvest income for himself. During the same period, the community paid $6,225 in taxes and $8,935 in improvements on the adjoining land Phillip held as his separate property. In addition, Joyce used $7,772 of her separate funds to pay community expenses, when the community ran out of money in the first half of 1994.

The court issued a tentative decision on May 28, 1999. It found that, in general, "the credibility of [Joyce was] sound, and the credibility of [Phillip] quite suspect in many regards." The court listed the $60,000 credit line as a community debt to be divided equally between Phillip and Joyce. It also ordered Phillip to reimburse Joyce for one-half of: (1) the $15,000 she had advanced him from equity line proceeds to harvest the raisin crop; (2) the $7,772 in separate funds used to pay 1994 community expenses; (3) the $19,667 in community funds used to pay 1994 ranch expenses; and (4) $15,160 in community funds used to pay for taxes and improvements on Phillip's separate property.

The court adopted the tentative decision as its statement of decision, and entered judgment on August 25, 1999. Phillip moved for new trial, which was denied by operation of law. This appeal ensued.

DISCUSSION

I-IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

V

*Community Funds Spent on Phillip's Separate Property*

■ Phillip contends the court erred in ordering him to reimburse Joyce for her share of community funds used to pay taxes and install a drip irrigation system on his separate real property. We agree the court erred in ordering Phillip to reimburse the community for funds used to pay his property taxes, but conclude the drip irrigation system was an improvement for which reimbursement was justified.

---

*See footnote, *ante*, page 962.

Absent an agreement to the contrary, the use of community funds to improve the separate property of one spouse does not alter the character of the separate property. (*In re Marriage of Camire* (1980) 105 Cal.App.3d 859, 866 [164 Cal.Rptr. 667] (*Camire*); *In re Marriage of Jafeman* (1972) 29 Cal.App.3d 244, 256 [105 Cal.Rptr. 483] (*Jafeman*).) Before the series of statutory amendments which began in 1973, husbands had exclusive management and control of community property. (Former Civ. Code, §§ 5125 & 5127; Stats. 1969, ch. 1609, §§ 24-25, pp. 3358-3359; Stats. 1973, ch. 987, §§ 14-15, p. 1901; Stats. 1974, ch. 1206, §§ 4-5, pp. 2609-2610; *In re Marriage of Gowdy* (1986) 178 Cal.App.3d 1228, 1231, fn. 2 [224 Cal.Rptr. 400].) Courts presumed that if a husband expended community funds to improve his wife's separate property, it was a gift. If, however, a husband used community funds to improve his separate property, the community was entitled to reimbursement. (*Jafeman, supra,* at p. 256.) The courts reasoned that when the husband exercised his power as manager of the community funds to improve his own separate property, "recoupment by the community [was] necessary in order to avoid constructive fraud against the wife." (*Ibid.*) The *Camire* court explained in 1980 that the rule was required "to protect the wife from diminution of properties under the control of the husband." (*Camire, supra,* at p. 867.) Acknowledging the change in law which gave management and control of community assets to either spouse (former Civ. Code, §§ 5125, 5127, now Fam. Code, §§ 1100, 1102), the court nonetheless preserved the gift presumption, concluding that "the traditional rule of law which denies either apportionment or reimbursement for community contribution to a wife's separate property [had] not been overruled." (*Camire, supra,* at p. 867.)

Joyce offers two arguments in response to Phillip's claim the gift presumption applies to the use of community funds to improve his separate property. First, Joyce argues the rationale of *Camire* and *Jafeman* is unsound in light of the current state of the law regarding management and control of community assets. She says the same rule of reimbursement should apply whenever community funds are used by one spouse to improve the separate property of the other spouse. Joyce asserts that "[t]he outmoded, sexist rationale that women are unable to protect themselves cannot, in the 21st Century, serve as a basis for allowing one spouse to profit at the expense of the other."

In her second argument, Joyce maintains that there is no meaningful difference between community funds used for property improvement such as installation of a drip irrigation system, and community funds used for property acquisition such as mortgage payments. Both result in an increase in equity which the community should share. Joyce emphasizes that Family

Code section 2640, which authorizes reimbursement for separate property contributions to the acquisition of community property, includes "payments for improvements" in its definition of " '[c]ontributions to the acquisition of the property.' "

■ We agree there is no logical basis for denying a spouse reimbursement for a community-funded improvement to the other spouse's separate property. The rule we discard—that is, the presumption of a gift in those circumstances—is also outside the mainstream of community property principles applied in other American jurisdictions. It is a California invention, though not one in which we should take pride, cobbled together from misunderstood doctrine and miscited cases.

■ As Joyce points out, California courts do not presume a gift when community funds are used to contribute to the purchase or reduce an encumbrance on a separate asset. Indeed, in such a circumstance, our courts recognize a co-ownership interest irrespective of the status of title. (*In re Marriage of Moore* (1980) 28 Cal.3d 366, 371-372, 373-374 [168 Cal.Rptr. 662, 618 P.2d 208] (*Moore*); *In re Marriage of Branco* (1996) 47 Cal.App.4th 1621, 1627 [55 Cal.Rptr.2d 493] (*Branco*).) ■ There may be principled reasons for distinguishing between community-funded improvements and community contributions to equity, but there are no cases explaining why the distinction supports a gift presumption as to improvements.

The most compelling cases concerning the gift presumption are those explaining why a gift should *not* be presumed when a spouse applies community property to improve his or her own property. However, explaining a rule's exceptions provides no support for its general application. Other community property jurisdictions do not presume a gift under such circumstances. Consistent with Spanish law, some require reimbursement to the community upon dissolution. Others impress an equitable lien on the improved separate property securing an obligation to reimburse.

The California Supreme Court's decision in *Smith v. Smith* (1859) 12 Cal. 216 (*Smith*) demonstrates that California was once in the mainstream of community property law on these questions. Citing decisions from Texas and Louisiana, the court concluded that where a husband used community property to construct a house on a parcel of land purchased with separate funds and later conveyed to his children, his wife was entitled to reimbursement for one-half the value of the improvement. As explained by the court, "It follows, therefore, that the [wife], upon the dissolution of the community, was entitled to one-half of the building erected out of the funds of the

common property; and, as the title of the land is vested in the children, the separate value of the house and land should be first determined, and a sale then decreed of both, with directions to pay to her one-half of such proportionate part of the proceeds as the value of the house bears to the entire property." (*Id.* at p. 226.)

The Supreme Court addressed the question again a year later in *Noe v. Card* (1860) 14 Cal. 576 (*Noe*). In that case the husband received a land grant subject to conditions, among them a requirement that he erect a fence and house on the property within a year. (*Id.* at p. 597.) After concluding that the grant constituted a gift of separate property to the husband, the court considered the effect of community funds expended to construct the fence and house. (*Id.* at pp. 606-607.) The court observed that "[l]abor or expenditures, incurred for the preservation or improvement of separate property, did not, under the Spanish law, operate to change its character. They only created a charge against the same, which was allowed in the liquidation of the community. The buildings and other improvements went with the property to the separate owner, and their cost only was allowed to the community." (*Id.* at p. 606.) Thus, whatever the community spent to perform the conditions attached to the land grant constituted "only a claim in its favor against the [husband's] separate estate," and in no way affected the separate character of the property granted. (*Id.* at p. 607.)

*Smith* and *Noe* involved the husband's use of community funds to improve his own separate property, a circumstance in which the gift presumption has never been applied. However, in both cases the court recognized a general rule of reimbursement, emanating from Spanish law, and set forth in the case law of Texas and Louisiana, which was not limited to the husband's use of community funds to improve his own property.

*Peck v. Brummagim* (1866) 31 Cal. 440 (*Peck*) is the first case involving a husband's expenditure of community funds on his wife's separate property.[2] In that case, the husband used community funds to purchase land which he had ordered vested in the wife's separate name as a gift. Thereafter, he expended community funds to construct a house on the property. (*Peck, supra,* 31 Cal. at pp. 444-445.) The husband died and the administrator of his estate claimed the expenditure of community funds created a community interest in the house, against which his creditors had valid liens. (*Id.* at p. 449.) The court rejected the administrator's arguments.

---

[2]In *Lewis v. Johns* (1864) 24 Cal. 98, 103-104 (*Lewis*), the court held a wife was not obliged to compensate her husband for *services* in planting a crop of wheat on wife's separate property. While *Lewis* has been cited as a seminal case for the later developed gift presumption, the holding of the case is quite narrow and does not encompass expenditures of money for improvements to a wife's separate property.

In an apparent reference to the doctrine of accession, the court noted the house "formed a part of the real estate, and the title to the house is necessarily included in the title to the lot on which it is erected." (*Peck, supra,* 31 Cal. at p. 449.) At the same time, the principles of *Smith* were not lost on the court, which recognized the community's potential reimbursement claim. (*Id.* at pp. 449-450.) However, the husband's intent was not clear in *Peck.* If he intended a gift to the wife, then the community would have no claim of reimbursement. If no gift were intended, then it would appear that under principles recognized in *Smith,* the community would have a reimbursement claim. On that record, the court refused to imply a lien, and explained: "The money was expended by the husband on his wife's property, so far as the case shows, at his own instance. *We do not undertake to say that the expenditure was or will be presumed to have been gratuitous,* but no lien upon the lot or house arose in his favor by reason of his expenditure of the common property in the erection of the house. The law defining the rights of husband and wife has not given such lien, and on principle and in analogy to cases where the marital relation does not exist between parties in which one owns the land and the other appropriates his money or labor to its improvement, we are satisfied that equity will not infer or establish a lien." (*Id.* at p. 450, italics added.) The court continued: "If the expenditure of the common funds by the husband was not in fact or should not be deemed gratuitous, the claim for repayment could not be established or enforced in this action. It is as foreign to the objects of the action as would be a claim for personal services that he may have rendered in attention to her separate estate." (*Ibid.*) The court thus expressly declined to presume a gift, though it also declined to impose a lien.

*Smith, Noe, Lewis,* and *Peck* were decided within eight years of each other. Over two decades passed before the Supreme Court again considered the use of community funds for separate property improvements and acquisitions. In *Flournoy v. Flournoy* (1890) 86 Cal. 286 [24 P. 1012] (*Flournoy*), the husband used his separate funds to help the wife acquire land in her name. The land was subsequently sold, and the husband claimed an interest in the proceeds. (*Id.* at pp. 290-291.) The court rejected the husband's claim, pointing out the parties dealt with each other as if they were unmarried. There was no intention that he was to become part owner of the land by virtue of his separate property loan. The intent was that it should be her separate property. (*Id.* at pp. 292-293.) The court explained that "[t]he husband could not, by voluntarily paying the balance due on the property, convert it into community property to that extent. His payment, being voluntary, and without her knowledge or consent, could give him no right or interest in the property, or change it from separate to community property. [Citation.] [¶] To give it such an effect would be to violate the express

understanding and intention of the parties, and hold the plaintiff liable for an obligation which she never incurred. This we cannot do. [Citations.]" (*Id.* at pp. 293-294.) The court concluded that in these circumstances "[i]t must rather be presumed that it was the intention of the husband to advance the money paid for the benefit of the wife's separate estate, . . ." (*Id.* at p. 294.) What the court loosely characterized as a "presumption" was, in reality, an inference from the evidence. *Flournoy* thus stands for the unremarkable proposition that a husband who loans his own money, with no strings attached, cannot later claim an interest in property acquired by the wife with the money. Indeed, the *Flournoy* decision would be of little relevance to the present discussion had it not been so terribly distorted in a later Court of Appeal decision, *Carlson v. Carlson* (1909) 10 Cal.App. 300 [101 P. 923] (*Carlson*).

In *Carlson*, the husband contributed labor and funds to the construction of a house on the wife's separate property. (*Carlson, supra,* 10 Cal.App. at p. 301.) Reversing a judgment compelling the wife to pay the husband one-half the value of the improvement, the Court of Appeal correctly concluded that: (1) under *Noe, supra,* 14 Cal. 576, the expenditure of labor and money "have no operation upon the direction of the title" but at most create a claim for reimbursement; and (2) under *Peck, supra,* 31 Cal. 440, no lien was thereby created. (*Carlson, supra,* 10 Cal.App. at p. 303.) Remarkably, the court then cites *Flournoy* for the rule that "[t]he law will not infer from such expenditures alone an agreement either to change the character of the property or an intent to charge the same with a lien. It must rather be presumed that it was the intention of the husband to advance the money paid for the benefit of the wife's estate and that it was intended to accrue to her interest." (*Carlson, supra,* at p. 303.) In other words, what in *Flournoy* had been an inference based on the evidence was transformed into a presumption of law in *Carlson*.

The Supreme Court ignored this reading of *Flournoy* when it decided *Shaw v. Bernal* (1912) 163 Cal. 262 [124 P. 1012] (*Shaw*). In *Shaw*, the husband used community funds to construct a house on the wife's separate property. (*Id.* at pp. 265-267.) On the question of title, the court applied the well-established principle, articulated in *Peck, supra,* 31 Cal. at p. 448, that "the title to the building follows the title to the land and is separate property of the wife, and neither he nor the marital partnership has any title to any portion of the property, either land or building." (*Shaw, supra,* at p. 268.) Continuing, the court acknowledged that while the wife had title, the community might nonetheless have a right of reimbursement: "The authorities hold that the most that the marital partnership may acquire under such circumstances, if anything, is a right to reimbursement to the extent of the value added to the property by the improvements. Whether the right to

reimbursement exists in such cases is a question not at all involved in this proceeding and we express no opinion thereon." (*Ibid.*)

The question avoided in *Shaw* was addressed in *Dunn v. Mullan* (1931) 211 Cal. 583 ·[296 P. 604, 77 A.L.R. 1015] (*Dunn*), a quiet title action brought by the husband's administrator following the death in quick succession of both husband and wife. (*Id.* at p. 585.) Among the issues was a claim by the husband's administrator that the husband's expenditure of community funds to construct a house on the wife's separate property imbued the property with a community interest. (*Id.* at p. 588.) As the court had previously decided, construction of a house with community funds did not affect title to property and did not give rise to a lien. (*Id.* at p. 589.) Thus, the husband's quiet title action was doomed on this and other grounds. (*Id.* at p. 592.)

However, the *Dunn* court did not stop with this resolution of the question, and proceeded, in dicta, to express views that became the source of the rule which we now reject. Citing *Carlson* and its erroneous reading of *Flournoy* as support, the court declared: "We think the same reasoning which warrants a presumption that a husband did not intend by the expenditure of community funds for the benefit of his wife's separate property to create a lien upon said property compels the conclusion that he did not expect repayment for the community funds expended by him to improve his wife's separate property or to relieve it of an encumbrance." (*Dunn, supra,* 211 Cal. at p. 589.)

The *Dunn* court did not elaborate in any detail on the "reasoning which warrants [the gift] presumption," except to cite two largely irrelevant Supreme Court cases[3] and dicta found in an earlier Court of Appeal case, *Provost v. Provost* (1929) 102 Cal.App. 775 [283 P. 842] (*Provost*). (*Dunn, supra,* 211 Cal. at pp. 589-590.) In *Provost*, the wife successfully asserted a community interest in the husband's separate property, which had been improved with community funds. (*Provost, supra,* at pp. 776-778.) While acknowledging the wife's claim, the court declared that, were their roles reversed, the husband would not have a claim against the wife because "[i]t must rather be presumed that it was the intention of the husband to advance the money paid for the benefit of the wife's estate and that it was intended to accrue to her interest." (*Id.* at p. 780.) Like the court in *Carlson*, the *Provost*

---

[3]The other cases cited for the proposition involved clear gifts: *Alferitz v. Arrivillaga* (1904) 143 Cal. 646, 649 [77 P. 657] where the husband conveyed property to the wife by deed ("A deed of conveyance is not merely evidence of a gift or other grant. It is the gift or grant itself"); *Kimbro v. Kimbro* (1926) 199 Cal. 344, 346-347 [249 P. 180] (husband's purchase of real property in the name of his wife before their marriage did not create a joint tenancy).

court relied on *Flournoy* for this principle. (*Provost, supra,* at p. 780.) As we have explained, the reliance was sorely misplaced.

The *Dunn* court's gift presumption, though dicta, and shaky dicta at that, became gospel as Courts of Appeal adopted it as the ratio decidendi without any thoughtful examination or discussion. In *In re Marriage of Lucas* (1980) 27 Cal.3d 808, 816 [166 Cal.Rptr. 853, 614 P.2d 285] (*Lucas*), the Supreme Court described the gift presumption for guidance on remand where the wife applied her separate funds to improve community property, though the court's decision was later abrogated by statute. (*In re Marriage of Cochran* (2001) 87 Cal.App.4th 1050, 1061 [104 Cal.Rptr.2d 920].) However, the Supreme Court has never adopted the presumption of a gift as a rule of decision in any case. We are thus free in the present case to construct a rule consonant with precedent and logic.

There is little logic in a rule that presumes an unconditional gift when one spouse uses community funds to improve the other spouse's property. Husbands and wives rarely plan for dissolution of a marriage, and if they did, it is fanciful to suppose that a spouse would wish the divorcing partner to walk away from the marriage with property enriched by an infusion of community funds and with no obligation to reimburse. The presumption is simply not grounded in human nature or experience. Nor is it in accord with public policy, which presumes acquisitions during a marriage to be community (*Lucas, supra,* 27 Cal.3d at pp. 812-814), and disfavors changes in characterization without strict adherence to formalities; this ensures thoughtful deliberation before decisions with potentially far-reaching consequences are made. (See *Estate of MacDonald* (1990) 51 Cal.3d 262, 268-269 [272 Cal.Rptr. 153, 794 P.2d 911].) As we explained, our courts do not indulge such a presumption when community funds are used to assist in the purchase or to reduce an encumbrance on a separate asset. The application of community funds results in what amounts to co-ownership of the asset. (*Moore, supra,* 28 Cal.3d at pp. 371-372, 373-374; *Branco, supra,* 47 Cal.App.4th at p. 1627.) There is no reason to presume a gift when funds are applied to *improve* separate property.

The proper measure of the community's reimbursement rights is another issue. Although there is no reason to distinguish between improvements and purchases in applying a gift presumption, there is nonetheless a distinction between the two enterprises. The expenditure of community funds to reduce an encumbrance on or otherwise assist in the purchase of separate property necessarily provides a benefit to the record owner measurable upon dissolution of the community. On the other hand, improvements do not always enhance the value of an asset; indeed, ill-advised improvements may well diminish the value of property.

Joyce makes no claim to the appreciation in value in the present proceeding and seeks only to recover one-half of the initial expenditure. Thus, we are not faced with a claim to the enhanced value of a separate asset attributable to a community-funded improvement nor, apparently, is there a claim that the improvement is without value. We also are not faced with the question whether the labor of a spouse to improve a separate nonbusiness asset creates a reimbursement claim. (Cf. *Pereira v. Pereira* (1909) 156 Cal. 1 [103 P. 488].) On the facts before us, Joyce is at least entitled to one-half of the amount expended on the improvement.

Accordingly, we conclude the court did not err in ordering Phillip to reimburse the community for half the amount paid to install the drip irrigation system on his separate property. Because tax payments do not come within the rule established in *Moore* (*Moore, supra,* 28 Cal.3d at p. 372), the court erred in ordering Phillip to reimburse the community for half the $6,225 in property taxes. We therefore modify the judgment to strike that portion of the amount Phillip owed Joyce.

DISPOSITION

The judgment is modified to strike Phillip's $3,112.50 reimbursement to the community for payment of taxes on his separate property, and affirmed as modified. Phillip and Joyce shall bear their own costs on appeal.

Davis, Acting P. J., and Raye, J., concurred.

A petition for a rehearing was denied September 19, 2001, and appellant's petition for review by the Supreme Court was denied December 12, 2001. Kennard, J., was of the opinion that the petition should be granted.